**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARVIN DOVBERG, individually and on behalf of a class of all persons and entities similarly situated,<br><br>Plaintiff<br><br>vs.<br><br>HALLER ENTERPRISES, INC.<br><br>Defendant | Case No. 5:26-cv-04286-JFL |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendant Haller Enterprises, Inc. ("Haller") asks this Court to enter judgment on the pleadings by adopting three propositions that courts in this District and across the country have repeatedly rejected: that a text message is not a "call," that a person who uses a cell phone for personal and household purposes can never be a "residential telephone subscriber," and that telemarketers may ignore the Federal Communications Commission's ("FCC") Caller ID rules without consequence. Each argument fails.

*First*, the TCPA reaches text messages. The meaning of the word "call" when Congress enacted the TCPA in 1991 encompassed any attempt to communicate by telephone, whether by voice or by text, just as Congress itself used the word "call" in 1990 and 1991 to describe written transmissions to TTY/TDD devices used by the deaf and to pagers. The Supreme Court, the Third Circuit, and the Sixth and Ninth Circuits have all treated text messages as calls, and multiple decisions of this District have done the same. The FCC's duly promulgated regulations, moreover, expressly apply the Do Not Call rules to "text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(e). Haller's contrary position rests on modern colloquial intuitions and a single out-of-circuit appellate decision that is not binding here.

*Second*, whether a subscriber is "residential" turns on how the subscriber uses the number, not on whether the phone is tethered to a wall. Congress protected residential telephone "subscribers," a description of the customer, not residential telephone "lines," the term it used in Section 227(b) when it meant the *physical facility*. Plaintiff pleads exactly what the statute requires: that his number is a non-commercial number that he uses for personal, residential, and household purposes. Haller's own text message calls confirm the point. They were addressed by first name to Plaintiff and his household ("Marvin and Barbara"), and they asked him to refer his

"friends and family," to a home services company he had once used. That is a consumer solicitation to a household, not a call to a business number, the distinguishing term used in the Act.

*Third*, the Caller ID rule at 47 C.F.R. § 64.1601(e) was adopted in the very same 2003 order that created the National Do Not Call Registry, for the stated purpose of allowing consumers to screen out unwanted telemarketing and to identify the companies they wish to ask not to call again. It was prescribed under Section 227(c), and it is therefore enforceable through Section 227(c)(5)'s private right of action, as nearly every court to consider the question since *Dobronski v. SelectQuote Insurance Services* has held, including a decision of this District in *Newell v. JR Capital*. Haller's remaining arguments about whether it complied with the rule, whether Plaintiff was within the zone of interests, and whether the violation was too trivial to matter are factual disputes or policy objections that cannot support judgment on the pleadings.

The motion should be denied.

## FACTS

Plaintiff Marvin Dovberg owns a personal cellular telephone number, which he placed on the National Do Not Call Registry in August 2012. Compl. ¶¶ 4, 20. The number is non-commercial, and Plaintiff uses it for personal, residential, and household purposes. *Id.* ¶¶ 18-19. Plaintiff last used Haller's services in the summer of 2022, and he never gave Haller permission to continue contacting him or consented to receive telemarketing from it. *Id.* ¶¶ 21, 23.

On June 4, 2026, Haller sent Plaintiff two text message calls from the number 717-482-9669. *Id.* ¶ 22. Both were addressed to "Marvin and Barbara," and both solicited Plaintiff to refer friends and family to Haller in exchange for a payment of up to $250, and directed him to a website promoting Haller's services, all for the purpose of generating new customers and business for

Haller's plumbing, HVAC, and electrical services. *Id.* ¶¶ 22, 24-25, 37. The text message calls were unwanted, frustrating, and intrusive, and they invaded Plaintiff's privacy. *Id.* ¶¶ 32-36, 40.

The calling number was provisioned through the carrier Telnyx, for which caller name ("CNAM") delivery was available. *Id.* ¶ 27. Telnyx allows its customers to set the CNAM to reflect their own name, but when a customer does not do so, the default CNAM transmits the geographic location of the telephone exchange instead. *Id.* ¶ 29. That is what happened here. Rather than transmitting Haller's name, the caller identification information transmitted for Haller's number read "MIDDLETOWN, PA." *Id.* ¶¶ 27-28. As a result, Plaintiff could not use Caller ID to readily ascertain who was contacting him. *Id.* ¶ 30.[1]

## LEGAL STANDARD

As Haller acknowledges, a motion for judgment on the pleadings under Rule 12(c) is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019). The Rules demand only a "short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," drawing on "judicial experience and common sense." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (cleaned up). A complaint need only contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

[1] Haller's motion repeatedly invokes matters outside the pleadings, including its assertion that its "records" show the texts were sent on different dates and that an established business relationship exemption applies, Mem. at 1 n.1, and its assertion that its "research to date" suggests Plaintiff maintains a landline, *id.* at 16. None of that may be considered on a Rule 12(c) motion without converting it to one for summary judgment, which Haller has not requested. Fed. R. Civ. P. 12(d). And even on its own terms, the established business relationship theory is foreclosed by the pleadings and the law, which limits a transaction-based relationship to the eighteen months following the subscriber's last purchase or transaction. 47 C.F.R. § 64.1200(f)(5). Plaintiff last used Haller's services in the summer of 2022, nearly *four years* before the June 2026 texts, and never gave Haller permission to keep contacting him. Compl. ¶ 23. And whether the two texts arrived on the same day or on different days is immaterial: Section 227(c)(5) requires only "more than one telephone call within any 12-month period." 47 U.S.C. § 227(c)(5).

662, 678 (2009) (cleaned up). A claim may be dismissed only where there are not "enough facts to state a claim to relief that is plausible on its face," not because the defendant proffers contrary facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Such a motion is not a device for testing the truth of what is asserted in the complaint or whether the plaintiff has evidence to back it up. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). And if matters outside the pleadings are presented and not excluded, the motion must be treated as one for summary judgment. Fed. R. Civ. P. 12(d).

## ARGUMENT

### I. Text Messages Are "Telephone Calls" Actionable Under Section 227(c)(5).

Consider a 1991 law that bars "vehicles" from a park. That law applies equally to sedans and to electric pickup trucks, even though the latter did not exist when the law was passed. So too here. Text messaging did not exist when the TCPA was enacted in 1991, but that is no matter: the plain meaning of the word "call" in the TCPA has long been understood to encompass any attempt to communicate by telephone, "regardless of whether that call is communicated by voice or text." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003) ("2003 Order").

#### A. The Supreme Court, the Third Circuit, Other Circuits, and This District Treat Text Messages as Calls.

Haller describes the authority on this question as though it runs in its favor. It does not. The Supreme Court has stated that "[a] text message to a cellular telephone, it is undisputed, qualifies as a 'call.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016). The Third Circuit has likewise treated text messages as calls under the TCPA. *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 117 n.3, 118 (3d Cir. 2018); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir.

2013). The Sixth Circuit has twice held that text messages are "calls" under the TCPA. *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). The Ninth Circuit reached the same conclusion in *Satterfield*, 569 F.3d at 953-54, and reaffirmed that understanding this year in *Howard*, which Haller dismisses as *dicta*. *See* Mem. at 10-11 (discussing *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1124-25 (9th Cir. 2026)). Indeed, the Third Circuit has looked to the *Satterfield* decision for guidance. *See Gager*, 727 F.3d at 269 n.2 (noting "[t]he TCPA's prohibition on automated dialing applies to both voice calls and text messages" and citing *Satterfield*).

District courts across the country continue to agree, including after the Supreme Court's decision in *Loper Bright*. *See, e.g.*, *Wilson v. Better Mortg. Corp.*, No. 25 Civ. 5503 (PAE), 2025 WL 3493815, at *5 (S.D.N.Y. Dec. 5, 2025); *Wilson v. MedVidi Inc.*, No. 5:25-cv-03996-BLF, 2025 WL 2856295, at *2-4 (N.D. Cal. Oct. 7, 2025); *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2-3 (N.D. Ill. 2025); *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4-5 (D. Or. 2025); *Esquivel v. Mona Lee, Inc.*, No. 3:25-cv-00607, 2025 WL 3275607, at *2 (S.D. Cal. Nov. 24, 2025); *Bosley v. A Bradley Hosp. LLC*, No. 25-cv-22336, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025); *Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-cv-1569, 2024 WL 184449, at *5 (M.D. Pa. Jan. 17, 2024). As the Southern District of New York put it, "although modern parlance tends to distinguish between phone calls and text messages, the meaning of 'telephone call' in 1991—when the TCPA was enacted—was broad enough to encompass text messages." *Better Mortg.*, 2025 WL 3493815, at *5.

District courts throughout this Circuit have long applied that holding. *See Brown v. Rita's Water Ice Franchise Co. LLC*, 242 F. Supp. 3d 356, 362 n.30 (E.D. Pa. 2017) ("Text messages are

'calls' within the meaning of the TCPA."); *Prukala v. Elle*, 11 F. Supp. 3d 443, 449 n.6 (M.D. Pa. 2014) (quoting *Gager* for the principle that "[t]he TCPA's prohibition on automated dialing applies to both voice calls and text messages"); *Bradshaw v. CHW Grp., Inc.*, 763 F. Supp. 3d 641, 649, 648 n.5 (D.N.J. 2025) ("Text messages are considered 'calls' for these purposes."). And they have applied the same understanding to the Do Not Call private right of action at issue here. In *King v. Bon Charge*, for example, the District of Delaware held that a text message counts as a "call" for purposes of section 227(c)(5)'s private right of action for any person who has received more than one telephone call within any 12-month period. *King v. Bon Charge*, 823 F. Supp. 3d 508, 526 (D. Del. 2025).

Closer to home, at least four recent decisions of this District have treated text messages as actionable under Section 227(c), and Haller does not dispute that each is contrary to the position it now presses. *See* Mem. at 11 (citing *Pero v. Brown-Daub Chevrolet of Nazareth*, No. 25-7016, 2026 WL 1747214, at *2-4 (E.D. Pa. June 17, 2026); *Newell v. Children's Dental Health Assocs., LLC*, No. 25-5238, 2026 WL 927378, at *5 (E.D. Pa. Apr. 6, 2026); *Cole v. C/T Install America, LLC*, No. 25-3531, 2026 WL 916582, at *1 (E.D. Pa. Mar. 23, 2026)); *Newell v. RxLink Inc.*, No. 2:25-cv-4270, ECF No. 43 (E.D. Pa. Mar. 12, 2026). Haller's efforts to wave those decisions away fail. It faults *Pero* for analyzing whether text messages are "telephone solicitations," Mem. at 11, but that is precisely the right question. Section 227(c)(5) does not stop at the words "telephone call." It grants a right of action to any person who has received more than one call "in violation *of the regulations* prescribed under this subsection," 47 U.S.C. § 227(c)(5) (emphasis added), and the *regulation* at issue prohibits initiating "any *telephone solicitation*" to a registered residential subscriber. 47 C.F.R. § 64.1200(c)(2) (emphasis added). Whether a text is a prohibited "telephone solicitation" is therefore the question that determines whether it was sent in violation of those

*regulations*. And Haller's attack on *Newell* and *Cole* for relying on *Campbell-Ewald* amounts to a complaint that those courts followed the Supreme Court's own description of the law.

Against all of this, Haller offers the Seventh Circuit's decision in *Steidinger v. Blackstone Medical Services*, 182 F.4th 532 (7th Cir. 2026), and a collection of district court decisions largely from outside this Circuit. *Steidinger* does not bind this Court, and it cannot be reconciled with the treatment of text messages by the Supreme Court, the Third Circuit, and the Sixth and Ninth Circuits. *Steidinger* is also internally inconsistent. It accepts that a text message may qualify as a "call" under Section 227(b), yet holds that the same word, in the same statute, *excludes* text messages a few paragraphs later in Section 227(c)(5). *See* 182 F.4th at 538-39. Courts outside the Seventh Circuit have declined to follow it for this reason. *See, e.g.*, *Miller v. S. Brown & Assocs., Inc.*, No. 2:26-cv-01480-MWC-SSC, 2026 WL 2855518, at *4 (C.D. Cal. Sept. 22, 2026) (declining to apply *Steidinger* and holding that "[t]ext messages constitute a call under § 227(c)" (quoting *Hopkins v. Homelight, Inc.*, No. 26-cv-5017-BHS, 2026 WL 2017320, at *4 (W.D. Wash. July 13, 2026))). For the reasons that follow, its reasoning is also unpersuasive on its own terms.

### B. The Ordinary Meaning of "Call" in 1991 Included Text-Based Communications.

Haller insists that no one today refers to a text message as a "call." Mem. at 5-6. That is not how statutory interpretation works. Courts look to a statute's ordinary "meaning at the time of … adoption," not "modern intuition." *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 114 (2019); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979). The "ordinary, contemporary, common meaning" of the word "call" in this context is "to communicate with or try to get into communication with a person by a telephone." *Satterfield*, 569 F.3d at 953-54 & n.3 (citation omitted).

Haller's own dictionary is to the same effect. The 1988 definition of "call" on which Haller relies is "to get or try to get into communication by telephone." Mem. at 6 n.3 (quoting *Webster's Ninth New Collegiate Dictionary* (9th ed. 1988)). That definition says nothing about voices. A text message sent to a telephone number and received on a telephone is, by definition, an attempt "to get into communication by telephone." Haller reaches a different result only by importing the word "voice" from elsewhere in the statute. Mem. at 6. But Section 227(c)(5) does not use the word "voice." Where Congress wished to limit a TCPA prohibition to voice communications, it said so expressly. *See* 47 U.S.C. § 227(b)(1)(B) (prohibiting calls "using an artificial or prerecorded voice"); 47 U.S.C. § 225(a)(3) (cleaned up) (defining "telecommunications relay services" as "telephone transmission services" that allow individuals who are deaf or hard of hearing to communicate in a manner "functionally equivalent" to "voice communication services"). Congress imposed no such limitation in Section 227(c).

Nor can Haller manufacture a voice requirement from the word "telephone." Haller pairs the 1988 definition of "call" with a separate definition of the noun "telephone" as "an instrument for reproducing sounds at a distance," and concludes that every "telephone call" must itself reproduce sound. Mem. at 5-6 & n.2. But "telephone" identifies the instrument through which the communication is attempted. It does not convert "call" into a synonym for spoken conversation. To make a "telephone call" is thus "to 'get or try to get into communication' with an 'instrument for producing sounds at a distance.' A text message therefore falls reasonably within the literal language of the statute." *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 WL 202930, at *5 (S.D. Tex. Jan. 26, 2026).

Haller's reading also proves too much. If a "telephone" were defined by sound transmission alone, that reading "would prevent an otherwise unlawful voice call using a telephone with any

modern features from falling under the statute," because nearly every modern telephone can send texts. *Id.* at *5. "Just as a mower that both cuts and conditions hay is still a mower, a telephone which communicates texts and voice is still a telephone." *Id.* (drawing on *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987)). The Seventh Circuit's own decision in *Erickson*, a case in which "the new technology was embraced by the old terms," *id.* at *5, is difficult to square with *Steidinger*'s approach. And Haller's observation that text messages "can be sent from one computer to another with no phone at either end," Mem. at 6, describes a case not before the Court, since the messages here were sent to Plaintiff's telephone number and received on his telephone. Compl. ¶¶ 4, 22.

The TCPA's own text confirms that "call" was never limited to oral communication. The autodialer provision uses the word "call" to describe transmissions to a "paging service," 47 U.S.C. § 227(b)(1)(A)(iii), the precursor technology to text messaging, which displayed incoming messages as written text. If a text "call" to a pager is a "call," a text call to a cell phone is too, because the paging provision shows "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1004-05 (N.D. Ill. 2010). The 1991 meaning of "call," in short, "refers to both oral and written communications" sent to a telephone number. *MedVidi*, 2025 WL 2856295, at *2.

Haller's cases, and *Steidinger*, go astray in two ways: by placing dispositive weight on modern intuitions about contemporary speech, and by treating the fact that text messages did not exist in 1991 as dispositive. *See Better Mortg.*, 2025 WL 3493815, at *9; *Bosley*, 2025 WL 2686984, at *5. As to the first, "modern intuition" does not always match the "evidence of the term's meaning at the time of" a statute's adoption. *New Prime*, 586 U.S. at 114. In *New Prime*, the Supreme Court recognized that the statutory term "contracts of employment" in the Federal

Arbitration Act might, in modern usage, exclude independent contractors, but held that the term reached them because evidence of the term's meaning at the time of enactment showed that it "usually meant nothing more than an agreement to perform work." *Id.* at 114-16. The same principle forecloses Haller's reliance on how an ordinary person would describe a text message today: the term "telephone call" means nothing more than a communication made to a telephone (and using a telephone number), just as it did in 1991.

As to the second, it is irrelevant that Congress did not have text messages specifically in mind in 1991. Statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315-16 (1980). Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that was front of mind when it legislated. *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009); *see also FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2505 (2025) (Congress may craft statutory mandates that accommodate developments in light of advances in technology). "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998). And "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020). Haller's reading would leave the privacy protections of Section 227(c) hostage to a predominant form of technology used to invade them, contrary to the principle that there are limits to the "power of technology to shrink the realm of guaranteed privacy." *Kyllo v. United States*, 533 U.S. 27, 34 (2001).

Haller's invocation of the fixed-meaning canon, Mem. at 5, only underscores the point. The passage of *Loper Bright* that Haller quotes for that canon is itself quoting *Wisconsin Central*,

which explained in the same breath that, "[w]hile every statute's meaning is fixed at the time of enactment, new applications may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018); *see Loper Bright*, 603 U.S. at 400. The question is therefore *not* whether texting *existed* in 1991, but whether a text falls within the *category* Congress used. If the meaning of "call" was fixed in 1991, then what matters is what the word meant then, "to get or try to get into communication by telephone," Mem. at 6 n.3 (quoting *Webster's Ninth New Collegiate Dictionary* (9th ed. 1988)), not whether texting had yet been invented. And by the same token, the 2018 amendment to Section 227(e) on which Haller relies, Mem. at 9, could not have changed what Congress meant by "telephone call" in 1991.

### C. The Statute's Structure Confirms That Text Messages Are Covered.

Haller's structural arguments fare no better. Section 227(c) is built around the defined term "telephone solicitation," which means "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4). That definition is "more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted." *MedVidi*, 2025 WL 2856295, at *3. The word "message" suggests that Congress had no particular technology in mind: a "message" is "[a]ny notice, word, or communication, no matter the mode and no matter how sent, from one person to another." *Message*, *Black's Law Dictionary* (6th ed. 1991). And "transmit" means "to send a signal by radio waves or by wire." *Transmit*, *Webster's College Dictionary* (1991). Congress referred to a "call or message" disjunctively to capture the full range of telephone technologies, *see Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012), because "[i]t cannot be argued… that text

messages are so categorially different from phone calls that the former cannot be considered an invasion of consumer privacy." *Skopos*, 2025 WL 2029274, at *4.

Haller and *Steidinger* invert this language through the surplusage canon, reasoning that because "telephone solicitation" covers a "call or message," a "telephone call" in Section 227(c)(5) must exclude any "message." Mem. at 7 (quoting *Steidinger*, 182 F.4th at 536). That does not follow. The surplusage canon asks courts to give every word effect. It does not license courts to shrink the ordinary meaning of one word so that a neighboring word will have more work to do. The word "message" in Section 227(a)(4) has independent meaning under Plaintiff's reading, because it ensures that the definition reaches communications to a telephone (*i.e.*, "telephone calls") of whatever form. Nothing about that choice suggests that Congress silently withdrew text-based communications from the ordinary meaning of "call," a word it used elsewhere in the same statute to describe written transmissions to pagers. 47 U.S.C. § 227(b)(1)(A)(iii).

The TCPA's own text confirms that the two words overlap rather than exclude one another. Section 227(b)(1)(B) prohibits initiating a "telephone call" to a residential line using a prerecorded voice "to deliver a message." 47 U.S.C. § 227(b)(1)(B). In Congress's own usage, then, a "call" is the means of initiating a telephone communication and a "message" is what that communication delivers; one communication can be both. And the Supreme Court recently declined to assign neighboring statutory terms artificially non-overlapping meanings merely to avoid surplusage, recognizing that ordinary terms often overlap and that Congress may deliberately use "broad, overlapping terms." *U.S. Postal Serv. v. Konan*, 607 U.S. 391, 393 (2026). That Congress defined "telephone solicitation" to reach any "call or message" shows only that it wanted the regulated category to be comprehensive, not that the two words are mutually exclusive.

Section 227(c)(5) itself confirms the point. The same paragraph that creates the right of action supplies an affirmative defense for a defendant that has implemented reasonable practices "to effectively prevent *telephone solicitations in violation of the regulations prescribed under* this subsection." 47 U.S.C. § 227(c)(5) (emphasis added). Haller reads that contrast as proof that Congress used the terms to mean different things. Mem. at 7. But on Haller's reading, the defense Congress wrote into Section 227(c)(5) would reach a broader category of communications than the liability imposed by the statute, and it makes little sense to provide an explicit affirmative defense to conduct the cause of action does not reach. The sensible reading is that Congress used the defined term "telephone solicitation" to describe the regulated communications and used "telephone call" to count the communications that trigger suit. A text message sent to a telephone number is both.

Nor does Section 227(c)(5) create a narrow island within Section 227(c). The right of action is keyed to calls "in violation *of the regulations prescribed under* this subsection," 47 U.S.C. § 227(c)(5), and those regulations prohibit "telephone solicitations" to registered numbers and expressly apply to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(c)(2), (e). Section 227(c)(5) is an enforcement provision, not a grant of rulemaking authority. The regulations it enforces necessarily arise under the preceding paragraphs, and Congress made them an express element of the cause of action. *Steidinger*'s construction therefore produces a conspicuous enforcement gap: the FCC may expressly prohibit a telemarketing text message call under Section 227(c), yet the consumer could not invoke the remedy Congress attached to violations of those very rules. The only other reference to "calls" in Section 227(c) confirms that Congress used the terms interchangeably: it directed the FCC to consider whether additional authority was needed "to further restrict telephone

solicitations, including those calls exempted under" the definition of "telephone solicitation." 47 U.S.C. § 227(c)(1)(D). That reference to "calls" exempted from a definition covering any "call or message" shows that Congress did not draw the line Haller imagines.

Haller's "meaningful variation" argument, that Section 227(b) uses "call" while Section 227(c)(5) uses "telephone call," Mem. at 8, fares no better and, again, helps Plaintiff. To begin, its premise is wrong. Section 227(b) itself uses the phrase "telephone call." *See* 47 U.S.C. § 227(b)(1)(B) (making it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message"). Haller's reading would therefore require "telephone call" to mean one thing in Section 227(b)(1)(B) and something else in Section 227(c)(5), and would make "call" and "telephone call" mean different things within Section 227(b) itself. That is the opposite of how statutes are read. "[I]dentical words and phrases within the same statute should normally be given the same meaning." *Monsalvo v. Bondi*, 604 U.S. 712, 726 (2025). The contrast on which *Card* rested, that Congress "could have used the broader term 'call' as it did in § 227(b), rather than 'telephone call,'" Mem. at 8, overlooks that Congress used *both* formulations in Section 227(b). *See Alvarez*, 2026 WL 202930, at *6 (rejecting the identical argument). In any event, the "call[s]" regulated by Section 227(b)(1)(A) are calls "*to any telephone number* assigned to a paging service, cellular telephone service," and the like. 47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). A call to a telephone number is a telephone call. The modifier "telephone" in Section 227(c)(5) makes explicit what Section 227(b) assumes; it does not carve written communications out of the statute.

Finally, the 2018 amendment to Section 227(e), Mem. at 9, shows the opposite of what Haller claims. Section 227(e)(8) limits its definitions to the "purposes of this subsection," confining whatever distinction it draws to Section 227(e). And even there, Congress described a

"text message" as coming from a "caller," just like a voice call, and required "caller identification" for both. By identifying two types of calls, both of which come from a "caller," the amendment reinforces rather than undermines the conclusion that text messages are calls. Congress's decision not to amend Section 227(c)(5), Mem. at 9, likewise proves nothing. There was no need to amend a provision that, as the FCC, the Supreme Court, and the courts of appeals had understood for years, already covered text messages.

### D. *Loper Bright* Does Not Change the Result.

Haller argues that the courts that have treated texts as calls merely deferred to the FCC and that *Loper Bright* and *McLaughlin* have undone that deference. Mem. at 10. But Plaintiff's reading is the best reading of the statute as a matter of ordinary textual analysis, independent of any agency interpretation, and the courts cited above reached that conclusion through their own textual analysis. *Satterfield* rested on the dictionary definition of "call," 569 F.3d at 953-54, and the Ninth Circuit has since confirmed that, although *Satterfield* was framed in terms of then-applicable deference, "it is clear from *Satterfield*'s substantive analysis that the conclusion would be the same even in the absence of *Chevron* deference," *Howard*, 164 F.4th at 1124; and *Jackson*'s textual analysis did not depend on any FCC interpretation. *See Jackson*, 2024 WL 184449, at *5.

The FCC's longstanding view that "call" encompasses both voice calls and text calls to wireless numbers, 2003 Order, 18 FCC Rcd. at 14115 ¶ 165, is simply consistent "with the statute's text, purpose, and context, and is informed by the agency's subject matter expertise," which "adds persuasive support that Congress intended § 227(c) to cover text messages." *Better Mortg.*, 2025 WL 3493815, at *8. And, as explained next, the regulation at issue does not depend on deference at all.

In that same vein, *Loper Bright* recognized that sometimes "the best reading of a statute is that it delegates discretionary authority to an agency," including authority to "fill up the details" of a statutory scheme. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Section 227(c) is such a delegation: Congress directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," 47 U.S.C. § 227(c)(1), and to prescribe regulations implementing the methods it found most effective. *Id.* § 227(c)(1)(E), (c)(2). Exercising that authority, the FCC promulgated a *regulation*, not an interpretive statement, providing that the Do Not Call rules "are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(e). Such a regulation has the force and effect of law. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 295-96 (1979). Neither *Loper Bright* nor *McLaughlin* purports to strip a legislative rule promulgated within an express delegation of its force and effect of law.

Finally, Haller's effort to dismiss the TCPA's remedial character, Mem. at 9-10, misses the point. Plaintiff does not ask the Court to disregard the statute's text in favor of its purpose. Rather, Plaintiff asks the Court to conclude, as a matter of good principles of statutory interpretation, that a careful analysis of the relevant statutory text itself covers text messages. But where, as here, Congress knows that communications technology evolves over time, courts should not lightly assume that Congress drew arbitrary lines based on the specific technology used, particularly in a section devoted to consumer privacy protections. *Esquivel*, 2025 WL 3275607, at *3. After all, "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). The provisions of the TCPA reach text messages.

## II. Plaintiff Has Plausibly Alleged That He Is a "Residential Telephone Subscriber."

### A. A Cell Phone Subscriber Can Be a Residential Subscriber.

Haller next asks the Court to hold that cell phones can never be "residential," no matter how they are used. Mem. at 12-15. That categorical rule has no footing in the statute's text or in the governing definitions. Section 227(c) protects "residential telephone subscribers" or, elsewhere, simply "residential subscribers." 47 U.S.C. § 227(c)(1), (c)(3). And, unlike the term "telephone call," the term "residential subscriber" is explicitly defined by the FCC regulations. A "residential subscriber" is simply "a subscriber … that is not a business subscriber" for tariff and billing purposes. 47 C.F.R. § 64.2305(d); *see* 14 FCC Rcd. 15550, 15692 (1999). And Congress did not protect residential telephone "lines" in Section 227(c), as it did in Section 227(b)(1)(B); it protected residential telephone "subscribers," a word that describes the customer who purchases service, not the hardware technology that carries it nor its physical location.

In the FCC's then-operative 1983 Access Charge Order, 93 F.C.C.2d 241 (1983), the Commission adopted access charge rules. The revised rule provided that "A line shall be deemed to be a residential line if the subscriber pays a rate for such line that is described as a residential rate in the local exchange service tariff," and that "A line shall be deemed to be a single line business line if the subscriber pays a rate that is not described as a residential rate in the local exchange service tariff." 47 C.F.R. § 69.104.

But even setting the regulatory definition aside, traditional statutory analysis forecloses Haller's argument. Unless otherwise defined, statutory text is given its ordinary meaning in the relevant context at the time Congress enacted the statute. *New Prime*, 586 U.S. at 113. A "subscriber" is anyone who receives a bill in exchange for service, so a person can be a "*telephone* subscriber" to any *telephone* service. *See Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 206 (S.D.N.Y. 2024). That leaves the word "residential," which, as used in the TCPA, is simply

the opposite of "business." *See Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359, at *2 (N.D. Ga. Aug. 7, 2025); 47 C.F.R. § 64.2305(d). The word "residential" thus refers to the *purposes* for which a phone is *used*, not its physical characteristics or location. *Jackson*, 2024 WL 184449, at *5-7. This distinction extends well prior to the enactment of the TCPA. In *Ottensmeyer v. Chesapeake & Potomac Tel. Co.*, the Fourth Circuit addressed a dispute over telephone company tariffs where whether service was provided as a "business" or "residence" depended on whether the "use is primarily or substantially of a business, professional, institutional or occupational nature" and that service may be classified as "residen[tial]" "where the primary use of the service is of a domestic nature and where the business use, if any, is merely incidental." 756 F.2d 986, 989 n.4 (4th Cir. 1985). *Ottensmeyer* demonstrates that courts around the time of the TCPA's enactment understood "residence service" to be a recognized *use* of telephone service, as opposed to merely a description of where the telephone happened physically to be located. Moreover, the classification turned principally on the character of the subscriber's service and use, with mixed use expressly contemplated.

*Jackson*'s textualist analysis is particularly instructive. There, the Middle District of Pennsylvania held that calls to cell phones can be calls to residential subscribers because, as a matter of statutory construction, "residential" and "telephone" are both adjectives that modify "subscriber" and describe the type of subscriber protected, a residential one, regardless of the technology the subscriber chooses to use. *Id.* at *5. And, as noted above, that conclusion finds support in FCC regulations dating to the 1990s that define "residential subscriber" as a subscriber who is not a subscriber to a telephone service for businesses. Nothing in the text suggests that Congress conditioned recovery on the presence of a physical wire.

The FCC's Do Not Call regulations confirm the point. The very rule Haller is alleged to have violated prohibits telephone solicitations to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry," 47 C.F.R. § 64.1200(c)(2), and the FCC has expressly provided that paragraph (c) applies to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." *Id.* § 64.1200(e). Haller's reading would render that provision a nullity. Haller never addresses it. Nor is Section 64.1200(e) a mere interpretive gloss that *Loper Bright* permits the Court to set aside; it is a codified legislative rule, adopted in the very rulemaking proceeding Congress directed the FCC to complete. *See* 15 U.S.C. § 6151, 6153.

Haller's authorities do not support its categorical rule. The only appellate decision either party cites on this question, *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022), rejected it, as Haller acknowledges. Mem. at 14. Haller cites no court of appeals that has adopted its position. Its principal authority from this District, *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 362 n.7 (E.D. Pa. 2019), Mem. at 12, addressed the question only in a footnote, in a case in which, as Haller acknowledges, the defendant had failed to respond to requests for admission. Mem. at 12. The Court in *Shelton* still found in the Plaintiff's favor on most counts. *Id.*

Other decisions of this District have not treated cell phones as categorically ineligible. In *Shelton v. Target Advance, LLC*, 2019 WL 1641353, at *5 (E.D. Pa. 2019), the court addressed claims involving the plaintiff's personal cell phone and turned on the fact that the phone was then being used for business and that the calls were directed to that business use. Years later, this District allowed *the same plaintiff* to proceed with Do Not Call claims involving the very same number once he returned it to personal use, explaining that past commercial use does not permanently eliminate standing where the number remains on the Registry. *Shelton v. Pro Source*

*Lending Grp. LLC*, No. 24-4394, 2025 WL 817485, at *4 (E.D. Pa. Mar. 14, 2025). The dispositive question, in other words, was use, not technology.

Haller's structural argument, that Section 227(b)(1)(A) addresses wireless phones while Section 227(b)(1)(B) addresses "residential" lines, Mem. at 13-14, confuses what each provision regulates. Section 227(b) regulates the use of particular equipment to reach particular *kinds* of telephone lines, speaking in terms of "services." Section 227(c), by contrast, protects a particular kind of *subscriber*: one whose telephone service is residential rather than business. *Jackson*, 2024 WL 184449, at *5. If anything, the variation Haller identifies cuts the other way. Congress knew how to refer to cellular telephone *service*, as opposed to residential *use*, when it wished to, and in Section 227(c) it did not exclude it. Indeed, the comparison Haller draws undermines its own reading. In Section 227(b)(1)(B), Congress protected a residential telephone "line," a physical facility, and courts in this Circuit have read that provision accordingly. *See Perrong v. Victory Phones LLC*, 519 F. Supp. 3d 193, 198 (E.D. Pa. 2021).

In Section 227(c), by contrast, Congress did not refer to "lines" at all; it protected residential telephone "subscribers." *See Jackson*, 2024 WL 184449, at *7. When Congress uses one term in one provision and a different term in a neighboring provision, courts presume the difference is deliberate. And even within Section 227(b), the protected categories are not mutually exclusive: a number used for personal, household purposes can fall within the protected technology provisions of Section 227(b)(1)(A)(iii) even though calls to it may ultimately be routed to a residential line. *Perrong v. Victory Phones LLC*, No. 20-5317, 2021 WL 3007258, at *7-8 (E.D. Pa. July 15, 2021). Overlap among the TCPA's categories is a feature of the statute, not evidence that Congress silently excluded every personal cell phone user from Section 227(c).

And Haller's appeal to legislative history describing calls "to the home," Mem. at 13, cannot override the statutory text. *Bostock*, 590 U.S. at 653; *Oncale*, 523 U.S. at 79. "[F]loor statements by individual legislators rank among the least illuminating forms of legislative history." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017). The Third Circuit has already rejected this precise move. Confronted with the argument that the TCPA's findings about "residential telemarketing practices" and "calls to the home" limited the statute's reach, it held that, "[a]lthough it is true that the TCPA placed particular emphasis on intrusions upon the privacy of the home in 1991, this expression of particular concern for residential calls does not limit—either expressly or by implication—the statute's application to cell phone calls." *Susinno v. Work Out World Inc.*, 862 F.3d 346, 349 (3d Cir. 2017). Congress itself recognized in 1991 that calls to cell phones implicate "the privacy rights this section is intended to protect." 47 U.S.C. § 227(b)(2)(C); *see Susinno*, 862 F.3d at 349. In any event, a subscriber's personal cell phone is where the domestic peace the TCPA protects resides for the majority of Americans. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 650 (4th Cir. 2019) (upholding TCPA jury verdict for calls to cell phones and noting the TCPA "affords relief to those persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace").

Nor does Plaintiff's reading "compel the impossible." Mem. at 14-15. Do Not Call compliance is based on which numbers are on the registry. A telemarketer checks the numbers it intends to call against the Registry, which accepts wireless numbers, and refrains from sending telephone solicitations to registered numbers. Nothing about that requires the telemarketer to know anything about how a subscriber uses his phone. To the extent there is any uncertainty about whether a registered number belongs to a business subscriber, that uncertainty can possibly supply an affirmative defense. And *that* information, whether a registered number belongs to a

"residential" or a "business" subscriber, *cf.* 47 C.F.R. § 64.2305(d), is readily available public information as to the rate class of a number that is ascertainable through various carrier databases, tariffs, rate tables, and other information properly reserved for discovery. And the type of subscriber is no more "unknowable" for a cell phone than for a landline, since that information is available from the same sources. Haller's parade of constitutional horribles, from *Dr. Bonham's Case* to Blackstone, is aimed at a strawman. And it is especially misplaced here, where Haller, which provides residential home services, Compl. ¶ 5, sent text message calls to a former customer and his household by their first names. *Id.* ¶¶ 22-23. Haller knew exactly whom it was sending text message calls to. And the Third Circuit has already rejected the contention that TCPA liability for calls to cell phones raises due process concerns. *See Susinno*, 862 F.3d at 349 n.1.

**B. Plaintiff Pleads Facts Establishing Residential Use.**

Haller alternatively contends that Plaintiff's allegations of residential use are conclusory. Mem. at 15-16. They are not. Plaintiff alleges that his number is his personal cellular telephone number, that it has been registered on the National Do Not Call Registry since 2012, that it is a non-commercial number, and that he uses it for personal, residential, and household purposes. Compl. ¶¶ 4, 18-20. That is precisely what is required. *Connor v. Servicequick Inc.*, No. 1:24-cv-02286-CNS-NRN, 2025 WL 2855393, at *2 (D. Colo. Oct. 8, 2025) ("Alleging that Plaintiff's phone number, which is listed 'on the DNC' registry, 'is not associated with a business and is used for personal purposes,' is sufficient to establish that Plaintiff is a 'residential telephone subscriber,' and not a business, under the TCPA.").

The Complaint's other allegations reinforce the inference. The text message calls themselves were addressed to "Marvin and Barbara," Plaintiff and a member of his household, and asked him to refer his "friends and family" to Haller's home plumbing, HVAC, and electrical

services in exchange for a cash payment. Compl. ¶¶ 5, 22, 24. They were not facially directed at any business nor offering business services. They were sent because Plaintiff had once been Haller's customer for home services. *Id.* ¶ 23. These were consumer solicitations directed to a household, not business-to-business calls directed to a business line offering to repair a walk-in refrigerator or a commercial dishwasher. *Cf. Target Advance*, 2019 WL 1641353, at *5 (calls selling business loans were directed to the business use of the plaintiff's phone). At the pleading stage, the Court must draw every reasonable inference from these facts in Plaintiff's favor.

Haller's demand for more, allegations about whether the phone was in the home when the texts arrived, how the number is held out to the public, and who pays the bill, Mem. at 16, would impose a heightened pleading standard that Rule 8 does not permit. The Rules require a short and plain statement of the claim, not detailed factual allegations. *Iqbal*, 556 U.S. at 678; *Connelly*, 809 F.3d at 786-87. The factors Haller lists are, at most, evidentiary considerations that some courts have weighed on a developed record when required. For instance, *Lee v. Loandepot.com, LLC*, No. 14-1084, 2016 WL 4382786, at *6-7 (D. Kan. Aug. 17, 2016), on which Haller relies, was decided at summary judgment. And Haller's assertion that its "research to date" suggests that Plaintiff maintains a landline, Mem. at 16, is outside the pleadings and cannot be considered on this motion. Fed. R. Civ. P. 12(d); *Swierkiewicz*, 534 U.S. at 511. In any event, maintaining a landline does not convert a personal cell phone into a business line. At most, Haller's contentions raise fact questions for discovery. *See Pro Source*, 2025 WL 817485, at *4.

## III. Section 227(c)(5) Provides a Private Right of Action for Violations of the Caller ID Rule, and Plaintiff Has Stated a Claim.

### A. Section 64.1601(e) Was Prescribed Under Section 227(c).

Section 227(c)(5) authorizes a private action by any person who has received more than one telephone call within any twelve-month period by or on behalf of the same entity "in violation

of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). The only question is whether the Caller ID rule, 47 C.F.R. § 64.1601(e), was "prescribed under" Section 227(c). It was.

In *Dobronski v. SelectQuote Insurance Services*, 773 F. Supp. 3d 373 (E.D. Mich. 2025), the court undertook the most comprehensive analysis of this question to date. Because "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), the court worked systematically through each provision of the TCPA that authorizes rulemaking: Section 227(b)(2), concerning prerecorded voices and automatic telephone dialing systems; Section 227(c), concerning the need to protect residential telephone subscribers' privacy rights; Section 227(d)(1)-(3), concerning technical and procedural standards for fax machines, automatic telephone dialing systems, and systems that transmit any artificial or prerecorded voice message; Section 227(e)(3), concerning misleading or inaccurate caller ID; and Section 227(i), concerning information sharing with the FCC. *SelectQuote*, 773 F. Supp. 3d at 376.

Only Section 227(c) fits because the other sections do not deal with anything resembling caller ID at all, and Section 227(e) was enacted in 2010, seven years *after* the FCC adopted the Caller ID rule in 2003. The Caller ID rule at issue here applies to every "person or entity that engages in telemarketing," 47 C.F.R. § 64.1601(e), regardless of the equipment used. It thus cannot be an autodialer or prerecorded voice rule under Section 227(b), and it is not a technical standard for fax machines, autodialers, or prerecorded voice systems under Section 227(d). And the rule has nothing to do with information sharing under Section 227(i). *See id.* at 376, 380.

Haller's contrary theory, that Section 64.1601(e) is a "technical and procedural standard" prescribed under Section 227(d), Mem. at 17-20, cannot be squared with that subsection's text. Section 227(d) authorizes standards for only three technologies: fax machines, automatic

telephone dialing systems, and "systems that are used to transmit any artificial or prerecorded voice message." 47 U.S.C. § 227(d)(1)-(3). The Caller ID rule, by contrast, applies to every "person or entity that engages in telemarketing," however the call is placed, including manually dialed calls. 47 C.F.R. § 64.1601(e). As Judge McHugh explained, "[i]t is difficult to discern how § 64.1601(e) could have been lawfully promulgated under § 227(d) without exceeding the FCC's delegated authority." *JR Cap.*, 791 F. Supp. 3d at 579. Haller's reliance on Section 227(d)(2)'s fax identification requirement, Mem. at 18, confirms the point. When Congress wanted identification requirements in the text of certain types of communications under Section 227(d), it tied them to the specific technologies that subsection governs. And when the FCC has adopted identification rules under Section 227(d), it has said so. *See, e.g.*, 7 FCC Rcd. at 8779 ¶ 53 (prescribing a prerecorded call identification rule under Section 227(d)(3)). Haller identifies no comparable statement for Section 64.1601(e). By Haller's own logic, that the FCC "knew how to identify the source of its regulatory authority," Mem. at 17, that silence as to Section 227(d) is telling.

Since *SelectQuote*, nearly every court to consider a Section 64.1601(e) claim has held that a private right of action exists, including two decisions of this District. *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571 (E.D. Pa. 2025); *Newell v. JR Cap., LLC*, No. 25-1419, 2026 WL 2408527, at *4 (E.D. Pa. Aug. 17, 2026) ("*Newell II*") (reaffirming at summary judgment); *see also Dobronski v. CHW Grp., Inc.*, No. 24-cv-11649, 2025 WL 2426370, at *7 (E.D. Mich. Aug. 21, 2025); *Dobronski v. Juliasangel Mktg., LLC*, No. 2:24-cv-12379-TGB-APP, 2025 WL 2659265, at *11 (E.D. Mich. Sept. 17, 2025) (addressing issue); *Barton v. Bright Solar Mktg. LLC*, No. 3:25-cv-05310-DGE, 2025 WL 2880136, at *5 (W.D. Wash. Oct. 9, 2025); *Dobronski v. Daraujo*, No. 25-10169, 2025 WL 3908484, at *8 (E.D. Mich. Dec. 1, 2025); *Barton v. Am. Fam. Life Assurance Co. of Columbus*, No. 3:25-cv-05671-TMC, 2026 WL 25742, at *5 (W.D. Wash. Jan. 5, 2026)

(default judgment); *Weingrad v. DaBella Exteriors, LLC*, No. 3:25-cv-396-SI, 2026 WL 496609, at *6 (D. Or. Feb. 23, 2026); *Novia v. Mobiz, Inc.*, No. 25-cv-11036-AK, 2026 WL 770036, at *7 (D. Mass. Mar. 18, 2026); *Novia v. Mobiz, Inc.*, No. 25-CV-11036-AK, 2026 WL 752181, at *4 (D. Mass. Mar. 17, 2026); *Carr v. Humana Inc.*, No. 3:25-cv-00476-DJH, ECF No. 28 (W.D. Ky. Mar. 23, 2026); *Dobronski v. Uppleger*, No. 25-10168, 2026 WL 905121, at *10 (E.D. Mich. Mar. 31, 2026); *Starling v. Homeover Gen. Contractors*, No. 4:25-CV-993-JDK, 2026 WL 1649101, at *4 (E.D. Tex. June 8, 2026).

Haller's contrary string cite, Mem. at 16-17, consists overwhelmingly of decisions that predate *SelectQuote* and rest on the reasoning *SelectQuote* rejected. *Worsham*, *Meyer*, *SunPath*, the 2020 *SelectQuote* decision, *Total Insurance Brokers*, *Tobias*, *Transamerica*, and *Griffin* were all decided before *SelectQuote*, and the Eastern District of Michigan, which produced most of them, has since changed course. *See SelectQuote*, 773 F. Supp. 3d at 380; *CHW Grp.*, 2025 WL 2426370, at *7; *Juliasangel*, 2025 WL 2659265, at *11; *Daraujo*, 2025 WL 3908484, at *8; *Uppleger*, 2026 WL 905121, at *10. Defendant's authorities largely reflect a kind of jurisprudential echo chamber, with courts repeating inherited conclusions rooted in underdeveloped, faulty reasoning that federal courts began to correct only after *SelectQuote*. As best Plaintiff can discern, *SelectQuote* was the first court to engage in such analysis, which *Newell* and the subsequent courts cited above credited. Those earlier decisions impermissibly severed a regulation promulgated under Section 227(c) from the private right of action Congress attached to violations of "the regulations prescribed under this subsection." If the rule was prescribed under Section 227(c), as it must have been, it is enforceable through Section 227(c)(5).

Haller's lone post-*SelectQuote* authority, *Tom v. Delancey Street Group LLC*, No. 26-1150, 2026 WL 2255107 (E.D.N.Y. Aug. 5, 2026), Mem. at 16, adds nothing. *Tom* acknowledged

*SelectQuote* and *Newell* but resolved the question in essentially a sentence, following what it called the "majority approach" because Section 64.1601(e) is itself silent about a private remedy. *Id.* at *6. That reasoning begins in the wrong place. Regulations never create their own causes of action; Congress does. The question is not whether Section 64.1601(e) contains remedial language, but whether it was "prescribed under" Section 227(c), for which Congress itself supplied the remedy. *JR Cap.*, 791 F. Supp. 3d at 580 ("Congress specifically authorized the FCC to issue regulations, and provided for a private right of action for all regulations issued under § 227(c)."). *Tom* did not undertake that inquiry. And twelve days after *Tom* was decided, Judge McHugh revisited the question at summary judgment and reaffirmed that Section 64.1601(e) is enforceable through Section 227(c)(5). *Newell II*, 2026 WL 2408527, at *4.

The regulatory history, including the sources Haller itself cites, confirms this conclusion. Section 227(c)(1) directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object," and, in that proceeding, to "compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights." 47 U.S.C. § 227(c)(1), (c)(1)(A). Section 227(c)(2) then directed the FCC to prescribe regulations implementing the methods and procedures it determined to be most effective. *Id.* § 227(c)(2). Caller ID is a method and procedure for doing so. And the FCC considered it in precisely that Section 227(c) proceeding: as Haller notes, in its 1992 order the FCC evaluated and declined, at that time, to require Caller ID because of cost and technological uncertainty. Mem. at 19 (citing *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8762

¶ 17 (1992)). That same 1992 order is the one in which the FCC adopted the company-specific do-not-call rules pursuant to the mandate of Section 227(c)(2). *See* 7 FCC Rcd. at 8756-57.

When the FCC revisited the matter and adopted the Caller ID rule in 2003, it did so in the very order in which, as Haller concedes, it invoked its Section 227(c) authority to create the National Do Not Call Registry. Mem. at 17 (citing 2003 Order, 18 FCC Rcd. at 14034, 14118-21). That Order invokes Section 227(c) dozens of times and mentions Section 227(d) only once, in discussing a 1997 rule for fax broadcasters, *see* 18 FCC Rcd. at 14134, and it tied the Caller ID requirements to consumer privacy: "Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers." *Id.* at 14068, 14118. The rule even borrows its operative term from the Section 227(c) regulations, applying to any person or entity that engages in "telemarketing, as defined in section 64.1200(f)(13)." 47 C.F.R. § 64.1601(e). And Haller does not dispute that the Do Not Call Registry rules adopted in the same Order are enforceable under Section 227(c)(5). It offers no principled reason why the companion Caller ID rule, adopted in the same proceeding, under the same mandate, to serve the same end, is not.

Haller's own description of the FCC's purpose seals the point. According to Haller, the FCC adopted the Caller ID rule so that consumers could "screen out unwanted calls" and "identify companies that they wish to ask not to call again." Mem. at 20 (quoting 2003 Order, 18 FCC Rcd. at 14118-19 ¶ 124). That is Section 227(c)'s mandate nearly word for word: to protect subscribers' "privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The text of the rule says the same thing. It requires that the number transmitted permit any individual to make a do-not-call request during regular business hours. 47 C.F.R. § 64.1601(e)(1); *see* Compl. ¶ 66. A rule whose function is to let consumers identify telemarketers

and make do-not-call requests is a Do Not Call rule aimed at protecting consumer privacy, and it was prescribed under the Do Not Call subsection of the statute.

Haller's remaining arguments do not change the analysis. That the FCC did not expressly recite Section 227(c) when adopting Section 64.1601(e), Mem. at 17, is beside the point; the question is which grant of authority actually supports the rule, and only one does. *Bowen*, 488 U.S. at 208; *SelectQuote*, 773 F. Supp. 3d at 376. Haller's invocation of the presumption against implied rights of action, Mem. at 18-19 (citing *Ziglar*, 582 U.S. at 133, and *Transamerica*, 444 U.S. at 20), is likewise misplaced. Plaintiff asks the Court to imply nothing. Congress created an express cause of action for violations of "the regulations prescribed under this subsection," and "[a] Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). The only question is the scope and source of that express right. *Novia*, 2026 WL 752181, at *6; *SelectQuote*, 773 F. Supp. 3d at 380. Haller's reliance on the headings of other subsections of Section 64.1601, Mem. at 18, proves nothing about the source of authority for a subsection that has no heading at all. It is, at most, an organizational choice by the FCC that has no bearing on the statutory source of its authority. And Haller's contention that Section 227(c) concerns only what happens before a solicitation is received, Mem. at 18, ignores the rule's very purpose, which, by Haller's own account, is to allow consumers to screen out unwanted calls before engaging with them and to stop future solicitations. Finally, the Truth in Caller ID Act of 2010, Mem. at 19, cannot retroactively reassign the authority under which a rule was adopted seven years earlier. That Act addressed a different problem, and Congress's choice to create a separate enforcement scheme for new Section 227(e) subtracts nothing from Section 227(c)(5), which by its terms reaches violations of all "the regulations prescribed under this subsection."

**B. Plaintiff Has Plausibly Alleged a Violation of Section 64.1601(e).**

Haller next argues that it complied with the rule because it identified itself by name in the body of its texts. Mem. at 20-21. Judge McHugh of this Court has already rejected a closely related argument. *JR Cap.*, 791 F. Supp. 3d at 584-85. Section 64.1601(e) requires telemarketers to "transmit caller identification information," defined as "either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer." 47 C.F.R. § 64.1601(e)(1). As Haller acknowledges, CPN and ANI refer to the calling party's number. Mem. at 20 (citing 47 C.F.R. § 64.1601(a)(1)). They are data transmitted with the call, not what happens to be said during it. "Caller identification information" is thus information transmitted with the call through the network, the information a recipient sees *before* deciding whether to engage, not self-identification buried in the content of a message. Haller's reading would allow any telemarketer to satisfy the rule by transmitting no name at all, so long as it named itself somewhere in the script or in the middle of a lengthy, full screen text message call.

As Judge McHugh explained:

> [T]hough clicking the link immediately leads you to JR Capital's website, this puts the onus – and risk of being the target of malware and phishing scams – on the recipient of the text. This stands in contrast with the clear purpose of the TCPA to protect consumers from nuisance calls and protect consumer privacy. . . . The administrative record further demonstrates that the FCC considered website urls as a form of compliance with § 64.1601(e)'s identification requirements, but did not implement that option. . . . Despite this specific request, the version of § 64.1601(e) promulgated did not include website urls as a compliance option.

The Complaint further alleges that CNAM was available through Haller's carrier, Telnyx, that Telnyx allows its customers to set the CNAM to transmit their own name, and that Haller instead transmitted the default geographic identifier "MIDDLETOWN, PA," rather than its name. Compl. ¶¶ 27-29. Those allegations, taken as true, state a violation of the rule's requirement that the telemarketer's name be transmitted when available from its carrier. And they are consistent

with the rule's purpose as Haller itself describes it: a consumer cannot "screen out unwanted calls" based on a name that appears only after the message has been received and read. The District of Massachusetts rejected a similar argument where the seller was named in the body of the texts, reasoning that the in-text identification did not address the recipient's injury from having to open and review the messages to learn who sent them. *Novia*, 2026 WL 752181, at *3.[2] Haller's effort to distinguish *Newell v. JR Capital* on its facts, Mem. at 21, only confirms that whether a telemarketer's transmission complied with the rule is a factual question inappropriate for resolution on the pleadings.

### C. Plaintiff Is Within the Zone of Interests Protected by the Statute.

Haller's zone of interests argument, Mem. at 21-22, fails on its own terms. The test asks whether a plaintiff's interests "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). Whether a plaintiff falls within that zone is a question of statutory interpretation, answered "using traditional tools of statutory interpretation," and courts ask not whether "in [their] judgment Congress should have authorized [the plaintiff's] suit, but whether Congress in fact did so." *Id.* at 127-28; *see Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015). Plaintiff is a residential telephone subscriber whose number was on the National Do Not Call Registry and who received multiple telemarketing message calls without the Caller ID information the FCC requires. Compl. ¶¶ 4, 18-30. He is precisely the person Section 227(c) and the Caller ID rule were designed to protect.

Haller's contrary argument rests on a version of "prudential" standing that the Supreme Court has since retired. Haller invokes the common law rule that a negligence plaintiff may not

[2] Haller's citation to Plaintiff's screenshots cuts against it. Those screenshots show that Plaintiff's phone identified the sender of both messages only by a bare number, "+1 (717) 482-9669," with no caller name at all. Compl. ¶ 22.

recover for violation of a statute unless the statute was designed to protect his class against the type of harm that occurred Mem. at 21-22 (quoting *Lexmark*, 572 U.S. at 129 n.5, and *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892)). But *Lexmark* itself made clear that, "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." 572 U.S. at 128 (cleaned up). And six years later, *Bostock* confirmed that when statutory language is clear and broad, a court may not confine it to its "expected applications." 590 U.S. at 676. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." *Id.* at 653. The "spirit" of a statute, untethered from its text, is precisely the kind of extratextual consideration *Bostock* forbids.

After *Lexmark* and *Bostock*, then, any zone of interests inquiry must be grounded in the statute's text, not in purposive glosses about the harms Congress principally had in mind. *See Bostock*, 590 U.S. at 676-78. As one commentator has put it, "[u]nder *Bostock*'s textualism, there is no room for a zone-of-interests test." Joseph S. Diedrich, *Bostock v. Lexmark: Is the Zone-of-Interests Test a Canon of Donut Holes?*, 89 U. Cin. L. Rev. 814, 825 (2021). In this District, Judge Pratter rejected a zone-of-interests challenge to a TCPA claim at the pleading stage, explaining that the question "is whether Congress did authorize" the suit and that "[n]othing in the text of the Act supports" the defendant's contrary theory. *Perrong*, 2021 WL 3007258, at *4.

Here, the text answers the question. Section 227(c)(5) extends its cause of action to any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). The statute thus defines both the protected class (persons who receive such calls) and the harm (receipt of calls that violate the Section 227(c) regulations), and Plaintiff alleges both.

Compl. ¶¶ 4, 18-30. Nothing in that text conditions the right to sue on the plaintiff's contemporaneous understanding of why a call was unlawful. "[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 590 U.S. at 669.

Haller's real argument is that Plaintiff did not personally know the reason for the Caller ID deficiency until his counsel queried the carrier's database. Mem. at 22. But neither Section 227(c)(5) nor *Lexmark* conditions a plaintiff's right to sue on contemporaneous awareness of the precise technical mechanism of the violation. The Complaint alleges that the violation harmed Plaintiff because he could not use Caller ID to readily ascertain who was contacting him, Compl. ¶ 30, and that allegation must be accepted as true. Plaintiff's phone identified the sender of the messages only by a bare number, with no name. *Id.* ¶ 22. The District of Massachusetts rejected an identical argument, that the plaintiff "did not know about the texts' technical non-compliance until [his] attorney investigated the issue," and held that a recipient of texts lacking required caller identification information alleged a concrete, particularized injury. *Novia*, 2026 WL 752181, at *2-3. How Plaintiff's counsel later confirmed the cause of that harm goes, at most, to proof—not to whether Plaintiff falls within the class of persons the statute protects.

**D. The De Minimis Doctrine Provides No Basis for Judgment.**

Finally, Haller contends that because its texts named Haller in their body, any deficiency in the caller identification information it transmitted is too trivial for the law to notice under the maxim *de minimis non curat lex*. Mem. at 22-23. The argument fails for three reasons.

*First*, the *de minimis* maxim is a background principle that governs only "absent contrary indication," *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992), and here Congress spoke directly to the threshold of actionable harm. Section 227(c)(5) does not reach every violation. It reaches only a person who has received "more than one" call "by or on

behalf of the same entity" in violation of the regulations in a twelve-month period. 47 U.S.C. § 227(c)(5). Congress thus wrote its own *de minimis* rule: a single call is not actionable, but two are. Plaintiff received at least two. Compl. ¶ 22. The Court may not superimpose a second, judge-made threshold on the one Congress chose. Just as a court "cannot limit a cause of action that Congress has created merely because 'prudence' dictates," *Lexmark*, 572 U.S. at 128, it cannot limit one because a defendant regards the violation as small. A *de minimis* exception for caller identification violations appears nowhere in the statute, and "when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 590 U.S. at 669. *Cf. Perrong*, 2021 WL 3007258, at *7 ("The TCPA does not contain a 'de minimis' charge below which a plaintiff cannot state a claim."). Haller's other authority, *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 374 (3d Cir. 2007), arose under the FLSA and has no applicability here.

*Second*, the harm here is not a trifle. It is the harm Congress identified, and a plaintiff in that position "need not allege any *additional* harm beyond the one Congress has identified." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016) (emphasis added); *see Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (two unwanted text messages). The Third Circuit has held that a single unanswered call inflicts a concrete injury, because in enacting the TCPA Congress "elevated a harm that, while 'previously inadequate in law,' was of the same character of previously existing 'legally cognizable injuries.'" *Susinno*, 862 F.3d at 352 (quoting *Spokeo*, 578 U.S. at 341). In so holding, the court reversed a district court that had reasoned that a single solicitation was not "the type of case that Congress was trying to protect people against," *id.* at 348, and reiterated that the traditional standing inquiry "requir[es] only that claimant allege some specific, identifiable trifle of injury," *id.* at 352 (cleaned up). The same is true of the caller identification violation here. In *Novia*, the court held that the failure to transmit required caller

identification information inflicts a concrete injury even where the seller was named in the text, because "there is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be." 2026 WL 752181, at *2. Plaintiff alleges precisely that injury. Compl. ¶¶ 30, 32-36, 40.

*Third*, Haller's policy objections, its concern about aggregate class-wide exposure and its professed solicitude for small businesses, are properly directed to Congress, not to a motion for judgment on the pleadings. And they ring hollow where, as alleged, compliance required nothing more than setting the caller name its carrier already allowed it to set. Compl. ¶ 29.

## CONCLUSION

For the foregoing reasons, the Court should deny Haller's Motion for Judgment on the Pleadings in its entirety. In the alternative, should the Court find any aspect of the Complaint deficient, Plaintiff respectfully requests leave to amend.

Dated: October 7, 2026

Respectfully submitted,

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, Pennsylvania 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

Attorney for Plaintiff and the Proposed Class

**CERTIFICATE OF USE OF GENERATIVE AI**

Artificial intelligence using WestLaw AI and Claude was used in the preparation of this filing, including the drafting of substantive content throughout, as well as for review and research of the Defendant's authorities and arguments. A person has checked the accuracy of all portions of the document generated by AI, including all citations and legal authority.

Date: October 7, 2026

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.

**CERTIFICATE OF NONCONCURRENCE**

I hereby certify that on September 9, 2026, counsel for Plaintiff, Andrew Roman Perrong, conferred with counsel for Defendant Haller Enterprises, Inc. regarding Defendant's Motion for Judgment on the Pleadings and the relief requested in this opposition, and that Defendant does not concur in Plaintiff's position.

Dated: October 7, 2026

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: October 7, 2026

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.